27 CSC Sugar LLC v. United States Mr. Diedrich Thank you, Your Honor. May it please the Court. This Court applies long-standing Supreme Court administrative law precedent to the Commerce Department's actions under the Tariff Act. When Commerce takes action unbacked by a reasoned explanation, as it did here, that action cannot stand. To start, Commerce must consider reasonable alternatives. The sugar at issue here is between 99.2 and 99.5 polarity, including Estandar. Under the original suspension agreements, Estandar entered the U.S. as, quote, other sugar, but it bypassed domestic refiners and was sold directly to consumers, unfairly competing with domestic refined sugar. To address this problem, multiple alternatives were on the table, such as keep the historic and relied-upon 99.5 dividing line and require all sugar under that line, including Estandar, be shipped in bulk. Counsel, let me ask you. One of the issues that you raise is that you say that the big problem here or one of the big problems is that, you know, the 2020 amendments were justified largely on the same terms as the 2017 amendments. But no party raised substantially different arguments in 2020 than were raised in the 2017 comments, which Commerce did address. Correct? No, Your Honor. In the 2017 proceeding, we certainly don't concede that everything was addressed there. And importantly, the litigation on the 2017 record only reached a point where Judge Gordon was able to vacate that amendment on a procedural defect for the ex parte memorandum. Right, but it was a procedural defect that had nothing to do with Commerce's addressing of the comments that were presented to it in 2017. Correct? No, Your Honor. With all due respect, I disagree with that because the problem was that CSC Sugar did not have the ability to comment on everything that influenced Commerce's decision-making. However, the more... Everything other than the ex parte comments, they did have an opportunity to comment on, right? Well, Your Honor, in 2017, that may be... I think that's a yes or no answer. In 2017, yes, but the record in 2020 is not the same and cannot be the same. And in fact, Commerce takes that position. But whether in 2017 or in 2020, the fundamental defect is that the Commerce Department did not adequately explain its chosen path. So just to return to the alternative... I'm just trying to understand what is the complaint. So in 2017, they didn't adequately explain their chosen path because they did not explain or comment on the ex parte materials and discussions. In 2020, they did, right? They disclosed those, commented on them, but then with respect to the other issues as to which nobody raised new arguments, they continued to stick to their original analysis, right? I don't think that's correct, Your Honor. And the problem is that the 2017 memoranda, including the explanation that Commerce provided, was never adjudicated for its adequacy. And that's what's up on review here now. And the reason why bulk shipment of sugar was an alternative that Commerce needed to consider was because bulk shipment of sugar is not food grade and must go to domestic refiners before being sold to consumers. And nowhere on the record in 2020 did Commerce consider this alternative independently. Nowhere, in fact, did it analyze bulk shipment of a standar, the problematic sugar, at all. Now, although Commerce's memos purport to consider both alternatives, meaning a polarity definition change and a bulk shipment option, those references are insufficient for two reasons. First off... I hate to pester you, but you still haven't answered my question. Were there new comments in 2020? Yes, Your Honor. All right, and where in the record did those appear? So, there would be a number of different comments. CSC Sugar's comments, for example, at Appendix 161... But were they substantially different? That's my point. Yes, Your Honor. They raised significant process and procedure arguments in light of... Different than the ones in 2017? Yes, Your Honor. Come on, do you understand what I'm trying to pin down? Okay, and what are the differences? With respect to the adequate explanation, they have some similarities. With respect to the process and the lack of reasoned decision-making, there are differences. You could not make those 2020 arguments in 2017 because the 2017 flaws had not been revealed at the time of commenting in 2017. Come on, you've got to answer my question. So, what you addressed in 2020 that was different were the exact flaws that Congress tried to fix in 2020, correct? The ex parte materials and discussions. That was different from both sides. Your Honor, I apologize if I'm not understanding your question correctly. That is one part of our claim, but it is an independent basis for vacating the 2020 amendments, which is what Congress did in 2020 in an attempt to explain its justification. That is separate and apart from any connection to the 2017 amendments. But it can be, if Your Honors are so inclined, informed by the background. But it is an independent basis for vacater this time around. And so, to return then, the reason why the references to both the polarity definition change and the bulk shipment are insufficient in the memoranda and in the amendment are for two reasons. First of all, if alternatives can be analyzed independently, they must be. And that is what the Supreme Court held in the DACA case, the HSV regions, where the government had argued that two separate alternatives were importantly linked. The court said that the government's argument misses the point and, quote, the fact that there may be a valid reason not to separate options does not establish that the agency considered that option or that such consideration was unnecessary. Second, these options in this case are not cumulative, even if they appear to be at first glance. Although the memoranda always consider bulk shipment of, quote, other sugar, they always simultaneously change the other sugar definition. And by changing two variables at once, the memos only consider bulk shipment of sugar under 99.2, which is not a standard and not the sugar that Commerce said was problematic. Are you saying that Commerce could not have reasonably determined that the change in polarity is easier to monitor than the bulk shipment requirements? Your Honor, Commerce could eventually reasonably determine that, but that is not before the court now. The challenge that CSC Sugar is raising is that Commerce did not consider on this record the alternatives that it needed to consider. And before this court or before Commerce can commit to a particular policy option, it has to consider reasonable alternatives. The adequacy of explanation is separate from whether or not a chosen option is lawful or backed by factual evidence. Commerce has to satisfy both of those standards for its action to be valid. Now, as far as evidence that bulk shipment would solve the Estandar problem, again, the very problem that Commerce had identified, we can look to party comments, including where CSC Sugar and others have pointed to other countries doing that very thing. Commerce, in fact, has observed on page appendix 4514 that other countries are doing that and they have not been exporting problematic sugar. And so as a matter of logic, as a matter of obviousness, which is one way in which the alternatives duty can be triggered, Commerce had to consider these things. I'm looking at the appendix 2307 where Commerce said that we, quote, we also explained that the change in polarity definition facilitates monitoring and verification. Are you saying that they didn't say that? Yes, Your Honor. I'm saying that they did not explain based on evidence and exercising their expertise. But there are multiple sides to that proposition. And you're saying they just said it but you don't think the explanation was good enough? I'm saying two things, Your Honor. First of all, yes, that their explanation was not good enough. It was conclusory. But second of all, that does not satisfy the duty to consider alternatives. That is only a justification of its chosen path. It does not explain what would happen to monitoring or verification if it were to do the bulk shipment only option. It does not explain why it is rejecting the bulk shipment only option. And it actually, in fact, that Commerce's chosen path leaves the problem that it had identified partially unaddressed. In Commerce's words, a standar was problematic because it bypassed domestic refiners and was sold directly to consumers. Yet because the amendments only require bulk shipment of sugar under 99.2, a standar can still bypass domestic refiners just like before. The duty to provide a sufficient explanation, including considering alternatives, is its own legal task, as I mentioned. Requiring Commerce to do that encourages transparency and accountability and discourages corner cutting. What about the explanation on JA-2274 where they actually describe Mexico's export licensing system in connection with their explanation that the polarity definition facilitates monitoring and verification? Again, Your Honor, that would be an example of where Commerce has considered export license changes in connection with the polarity change. But would also need to consider the export license changes in connection with the bulk shipment change. Because it has not explained anyway why it can only do the export license change in connection with polarity. It doesn't explain why it couldn't also do that or why it doesn't want to do that with respect to the bulk shipment change. Your Honor, I see that I'm into my rebuttal time. I'd like to reserve that unless there are additional questions at this time. I do have one question about this Chevron argument. Commerce is supposed to separately consider public interest factors. And as I see it, you think that because they mentioned public interest, all of a sudden we're in a Chevron framework? Well, Your Honor, I think that comes up in a little bit of a different way. Commerce, as you mentioned, of course, has to consider public interest. The Chevron issue did not arise until the trade court brought it up on its own in response to our argument that public interest was something that was unambiguous and warranted independent consideration. Right, but what is the statutory term or phrase that the trade court allegedly incorrectly interpreted? It would be 19 U.S.C. 1671 C.B.1.A. So you're saying that just because they looked at that, but they didn't interpret the language of the statute. They simply made a finding about whether Commerce's treatment of those public interest factors were reasonable, right? No, Your Honor. Both Commerce and the trade court, excuse me, Commerce interpreted that in its memorandum. But it also, anytime an agency applies the law, it necessarily interprets it. That's something that's part and parcel of American legal jurisprudence. And the fact that the trade court did not interpret that anew, but rather said it is accepting what Commerce did, that includes Commerce's interpretation, which C.S.C. Sugar in the trade court, and again on appeal, has said was an unambiguous term and not worthy of deference. And the government never responded, and therefore we submit that it waived that argument, waived any deference, and that the trade court improperly applied Chevron deference. So anytime an agency actually makes a decision, if a court agrees with that decision or finds it supported, then Chevron applies? Well, not necessarily. This case was unique because C.S.C. Sugar had made an argument about interpretation that was not responded to by the government as a respondent. And that's what tees this issue up, both for the court below and for this court. Okay. I'm sorry. I've used up some of your rebuttal. No, that's all right. We'll save the rebuttal time. Any more questions at the moment? No. No. Okay. Thank you. In that case, we'll hear from Mr. Edelstick. Thank you, and may it please the court. The court should affirm because Commerce fully complied with the law when the agency entered into the 2020 amendments to suspension agreements on Mexican Sugar. C.S.C.'s primary argument is that Commerce did not engage in reasoned decision-making, but the administrative record contains 78 pages of detailed explanation by Commerce. And this decision-making followed a robust administrative process whereby all parties, including C.S.C., had a full and fair opportunity to comment on a complete record and had an opportunity to put whatever evidence they wanted on this record. Do you agree, counsel, do you agree, though, that it really is, that the findings were almost identical to those in 2017? Yes, Your Honor, and C.S.C. would have this court disregard all 78 pages of that analysis just because Commerce provided the same explanation of substantially the same issues back in 2017, and Commerce did not take the time to rewrite it all from scratch in 2020. Well, why would Commerce ever do that? There's no legal requirement for Commerce to rewrite anything from scratch, and at the time, the domestic industry was suffering from a flood of problems associated with the Mexican Sugar imports. And Commerce had analyzed the same information, substantially the same comments once before. Why would Commerce take all that time? The argument on the other side seems to say that there were new comments that weren't addressed that even went to some of those same points. Your Honor, they've identified none. The entire thrust of their argument on appeal is that this was a mindless, copy-and-paste job, and that Commerce did not analyze the issues afresh. But there was a new assistant secretary at Commerce in 2020, and he approved the 2020 amendments in good faith, based on the record before him, after C.S.C. fully participated in the notice and comment process. And C.S.C. does not identify a single comment that was submitted to Commerce that was not sufficiently addressed by the agency. And was it a copy-and-paste job only because the remand was based on a procedural flaw, the failure to maintain a complete record of negotiations, rather than on the basic issues? Yes, indeed, Your Honor, and this is just a matter of good government. The government has to be able to correct a procedural flaw when one is found to exist, and that's exactly what the agency did here. Do you read the other side as actually making a claim that Commerce acted in bad faith? Well, that's what they would have to argue, and they expressly disclaim any argument of bad faith. They're essentially asking this court to conclude that Commerce did not mean anything it said in those 78 pages because this was a sham in bad faith. Well, there's no evidence of that, and there's no basis for that argument, and that's why they've backed away in their reply brief from any suggestion of bad faith here. Ultimately, Commerce had no obligation to take lots of extra time in the face of a domestic industry that was hurting just to rewrite things that were already written on the same issues that were already analyzed, and thus delay important relief for the domestic sugar industry. Reasoned decision-making just doesn't require that. Commerce's 78 pages of analysis plainly demonstrate that the agency engaged in reasoned decision-making. Now, on CSC's additional argument that Commerce had to consider an alternative, a supposed alternative of just adopting a bulk shipping provision without making a change to the polarity threshold for Mexican sugar, there's no evidence in the record supporting CSC's proposed alternative. Commerce had no duty to go down rabbit holes and evaluate theoretical alternatives with no basis in the record. There's no data. There's no economic analysis. There's nothing in this administrative record that would show that the bulk shipping provision standing alone would completely eliminate the harm from Mexican sugar. And under QVD Food, it was CSC's burden as an interested party to put data on the record if it wanted Commerce to evaluate that. CSC never did so. And more broadly, Commerce could not approve the 2020 amendments without a finding that they would completely eliminate the harm from Mexican sugar imports. The statute says eliminate completely. Commerce did not have the luxury of adopting CSC's proposed half measure when there was no record evidence whatsoever to back it up. But CSC says in the reply brief that they're not arguing the absence of substantial evidence. They're arguing a matter of process that Commerce just didn't explain the significant alternatives and why they chose what they chose. Right. Well, Your Honor, the agency has no duty to explain supposed alternatives that have no basis in record evidence. If CSC had submitted record evidence that the bulk shipping provision would have done such an amazing job at eradicating, eliminating completely, the supply and price problems associated with Mexican sugar, and it would have been equally easy to monitor, if that evidence had been in the record, I grant you that Commerce would have had an obligation to think about and discuss the matter. Would either alternative, though, have the same effect? Well, Your Honor, what we do know is that everyone concedes that both of these provisions tend to help solve the same problem. What CSC is arguing is that one of the provisions, the bulk shipping provision, provided such complete relief to the domestic industry that it rendered the polarity changes completely redundant, such that under the statute, Commerce could have found, without any basis in evidence, that the bulk shipping provision standing alone, that would completely eliminate the harm from the Mexican sugar imports. But there's just no evidence for that. Commerce has no obligation under the standard of review or under the APA cases that have been cited by CSC on this appeal. An agency has no obligation to go down rabbit holes and pursue alternatives when there's no factual record evidence to back it up. In fact, there was support in the record for doing both, doing both the polarity changes and the bulk shipping provision. At appendix pages 1130 and 3548, there was argument and evidence submitted by ASC, which my colleague Mr. Zielinski may address in his argument, which indicated that both the polarity changes and the bulk shipping provision increased the likelihood that the 2020 amendments would completely eliminate the harm. So there's just no support for this theoretical alternative that's not based on any record evidence whatsoever. And finally, on the public interest question, Your Honor's questions to Mr. Dietrich were right on the money. There's no Chevron issue here. There's no statutory interpretation issue here. The trial court correctly held that CSC had waived the rudiments of this statutory interpretation argument by failing to develop it with citations to pertinent authority such as Chevron. And regardless, Congress specifically identified three factors for determining whether a suspension agreement is in the public interest. Congress decided those, and there's no dispute that Commerce considered each and every one of the three statutory factors. And Commerce even went further and discussed the interest of the general public in its decision-making memoranda. So CSC's arguments about the public interest are right, but they're also wrong as a matter of law, and they're also contradicted by the record. Because Commerce fully complied with the law respecting suspension agreements when the agency entered into the 2020 amendments, the court should affirm. Thank you. Okay. Thank you. Any questions for Mr. Edelshick at the moment? No. No. All right. We'll hear from Mr. Zielinski. You've saved two minutes. Thank you, and may it please the court. I'd like to step back a little bit first and talk about the purpose of a suspension agreement and then maybe address some of Your Honor's questions from earlier. The purpose of a suspension agreement is to provide a forward-looking alternative form of remedy for the injuries suffered by the domestic industry from unfair imports. So here, rather than being subject to the up to 84 percent duties Commerce calculated, the Mexican government and the entire Mexican industry agreed with Commerce, with the support of the petitioners, to instead remedy the injury with the amended suspension agreement. CSC argues that Commerce, the government of Mexico, the entire Mexican industry, and the U.S. industry as a whole should have agreed to fewer obligations to lower the price of certain Mexican sugar. But as the Court of International Trade held in Imperial Sugar, a desire for low-cost sugar is not a valid interest under the statute. And a company's inability to continue sourcing low-cost sugar is not a valid harm. The entire point is to eliminate injurious import, not to encourage their purchase by lowering their price. Here, the record demonstrates that while the 2017 amendments were in effect, they fixed the injury that remained under the original agreements, which you can see at Joint Appendix page 500. And the domestic industry, including CSC and the dozens of other domestic liquid sugar refiners just like it, were stable. So it was logical and reasonable that when the original agreements were reimposed and the parties built a record that contained no new evidence to the contrary, Commerce, the Mexican government, and the entire Mexican industry did not reinvent the wheel. The 2020 amendments do as much as possible to best ensure the elimination of injury to the domestic industry as a whole, which is what's necessary under the law. And in reference to Judge O'Malley, your questions, in the first instance, you asked about what additional evidence there is. There was no additional evidence absent one page on Appendix page 168 that CSC submitted, which Commerce correctly determined was unusable because it came with no explanation and wasn't done in the normal course of business. And Commerce did, in fact, explain both reasons why it had to move the polarity line and the bulk shipment requirement, and that's at Appendix page 2307 where it addressed both independently. So unless your honors have any more questions for me. Any more questions? No. All right. Thank you. Then, Mr. Diedrich, rebuttal. Thank you, Your Honor. First off, the record does show that bulk shipment precludes direct sale to consumers. The reason why it does so is because that sugar must first go to refiners because if it's packed in bulk, it is not in food grade. Now, the attorneys for our opponents are unable to point to any place in the memos or the record where Commerce considered bulk shipment of Estandar sugar. That's between 99.2 and 99.5. The page just cited, 2307, does not do that. As far as the monitoring point is concerned, to test the polarity of sugar at entry, you have to use an instrument known as a polarimeter. However, if you're shipping in bulk versus shipping in food grade packaging, you only need your eyeballs. As far as the unusable evidence point, I'd like to respond to that briefly. CSE sugar submitted data, including numbers and an explanation accompanying that. At that point, Commerce's duty was triggered to ensure parties that are fully aware of what information it seeks, the form in which it seeks it, and if a party submits something that is not in a form in which Commerce considers it satisfactory, then Commerce has a duty to inform the party while the proceedings are still ongoing. Here, that was not done. Commerce never said anything about the insufficiency problem until after its decision. At the bottom line, Commerce needed to exercise its expertise. It must independently analyze each policy option, its effect on price and supply, injury from imports, and party and public interests. It did none of those three things here, whether in 2020 or in 2017. Upholding the 2020 amendments on this record without that adequate explanation would ignore and eviscerate a separate legal requirement and would redound to the detriment of agency, reliability, accountability, and integrity. Finally, your honor, there was a brief mention of the assistant secretary. Of course, the secretary was the same throughout these proceedings, Secretary Ross. And there was also a point about the suffering of the domestic industry that jibes with our general theme of the case, which is that the 2020 amendments were rushed, that Commerce was responding to status quo. But even setting that aside, it's important to remember that this is not a bad faith case. CSC Sugar has not raised any questions in 2020 about the motives of any agency official. This case is judged under the normal requirements that the Supreme Court and this court in similar cases have set forth for this type of dispute. The question—may I quickly finish, your honor? Yes, please do. The question is whether Commerce has supplied an adequate explanation and otherwise undertaken a reasoned decision-making process. Commerce has not done so here. The court should vacate the 2020 amendments and remand to Commerce. Thank you very much. Any questions for Mr. Diedrich? No. Okay, thank you. Thanks to all counsel. The case is taken under submission. That concludes this panel's argued cases for this session.